**In re CJL CO., INC., dba CJ Logging, an Oregon corporation, Debtor.**

**CJL CO., INC., dba CJ Logging, Plaintiff,**

**v.**

**BANK OF WALLOWA COUNTY, and the United States of America acting by and through the US Forest Service, Defendants.**

**Bankruptcy No. 385-04185. Adv. No. 86-0169-P.**

United States Bankruptcy Court, D. Oregon.

Jan. 9, 1987.

Ann K. McNamara, Portland, Or., for plaintiff.

Joel S. DeVore, of Mautz & Hallman, Pendleton, Or., for Bank of Wallowa County.

MEMORANDUM OPINION

ELIZABETH L. PERRIS, Bankruptcy Judge.

This is a proceeding by the Debtor-in-Possession, CJL Co., seeking an Order requiring the Bank of Wallowa County ("Bank") to turn over $19,904.82. CJL asserts that the Bank has no interest in the funds and wrongfully debited its account prior to the filing of the petition in bankruptcy. The Bank responds that it holds the funds pursuant to the agreement of the parties that $17,000 deposited in a certain money market account be held as security

for the issuance of a letter of credit/performance bond by the Bank to the United States Forest Service. The Forest Service has made demand upon the letter of credit. CJL and the Bank have submitted cross motions for summary judgment. The Forest Service has submitted an amended answer denying that it has an interest in the particular funds in question, and thus will not be affected by the outcome of these motions.[1] In essence, the Bank contends that it has a valid and enforceable security interest in the funds and seeks an Order allowing it to pay $17,000 to the Forest Service on its demand under the letter of credit. The Bank does not assert a claim in the interest that has accrued on the $17,000, and is willing to turn the interest payment over to CJL. The Debtor-in-Possession argues in its motion that it can take the position of the Internal Revenue Service, and through that position prevail over the Bank's interest in the funds. The Court finds that there are no issues of material facts concerning CJL's claim against the Bank, and based upon the findings and conclusions as stated herein, will render partial summary judgment in favor of the Bank.

## FACTS

In early March 1983, CJL was awarded a logging contract with the Forest Service for the Split Rock Timber Sale. As part of the contract, the Forest Service required CJL to furnish a performance bond. It had been CJL's practice to deposit cash directly with the Forest Service to guarantee performance and payment. The Forest Service, however, did not pay interest on those deposits. CJL's principals, Charles Johnson and Cathy Neal, decided that with this contract they would attempt to earn interest on the money used as the guarantee by placing the money in a bank, and having the bank issue a letter of credit/performance bond to the Forest Service.

CJL approached U.S. National Bank with inquiries about a bond. It then approached the Defendant Bank after learning that U.S. Bank, in addition to holding collateral, would take several weeks to process a bond and would charge a fee for its services. CJL proposed to the Defendant Bank that it issue a letter of credit to the Forest Service on the Split Rock contract, in return for the deposit of $17,000 into an account at the Bank. The parties understood that the Bank was going to hold the $17,000 as a security for the letter of credit.

On March 30, 1983, CJL deposited a check for $17,000 in a money market account with the Defendant Bank. On that same day, the Bank issued an irrevocable letter of credit for $17,000 to secure performance on the Split Rock Timber Sale. Although checks are usually issued with money market accounts, no checks were issued to CJL on this account # 69833. It was the parties' understanding that no checks would be issued and no withdrawals made from the account. CJL never attempted to withdraw money from the account. In short, it was the parties' intent and understanding that the $17,000 in account # 69833 was to be held by the Bank as security for the letter of credit issued by the Bank for the Split Rock timber sale.

The intent to create a security interest in the funds is evident from the testimony of Mr. Johnson and Ms. Neal, as well as in the particulars of the transaction itself. The signature card signed by both Mr. Johnson and Ms. Neal states in typewritten capital letters: "THIS IS A RESTRICTED ACCOUNT UNTIL 3-31-86 being held for a PERFORMANCE BOND." Placing a hold on an account or restricting an account is the Defendant Bank's method of holding an

1. Despite the Forest Service's answer, the United States, now in the guise of the Internal Revenue Service, appeared at the continued hearing on the motions for summary judgment seeking an Order allowing it to file a second amended answer asserting a cross claim against the Bank. The cross claim is based upon an allegedly superior tax lien. The Bank did not oppose this late development, and the Court allowed the amendment. Thus, this ruling cannot finally determine all the claims raised in this proceeding. The motions presently before the Court will be treated as motions for partial summary judgment, and this ruling will decide only the claim asserted by CJL against the Bank.

account as collateral. The Bank's Stop/Hold Journal records show that the account was carried as collateral for the performance bond from the day it was created. The "hold" was to be released on March 31, 1986, the expiration date of the letter of credit.

Subsequent to the issuance of the letter of credit for the Split Rock contract, the Bank issued several other letters of credit for CJL. None of these letters of credit were secured by deposit accounts. In January 1985, the Forest Service demanded payment upon one of these subsequent letters of credit. The Bank became worried that because of CJL's worsening financial condition it might attempt to withdraw the funds in the collateral account, and a Bank employee might mistakenly allow such a withdrawal. To insure that this could not happen, on January 27, 1985 the Bank transferred the funds by a debit memo from the restricted account to the general ledger account of the Bank. The statement issued by the Bank to CJL on February 18, 1985 showed a balance of zero and the debit of $19,904.82 on January 27, 1985.

## PROCEDURAL POSTURE

The amended complaint upon which these motions for summary judgment were filed seeks injunctive relief for the turnover of property of the estate.[2] There was no suggestion in the first amended complaint that the Debtor was seeking to exercise the voiding powers granted to the Debtor-in-Possession in Chapter Five of the Bankruptcy Code, or under any other grant of authority. Yet, in its motion for summary judgment, the Debtor states that it is authorized by the case of *Moore v. Bay,* 284 U.S. 4, 52 S.Ct. 3, 76 L.Ed. 133 (1931), to assume the position of the IRS and prevail over the Bank's interest in the funds. Its motion for summary judgment is based entirely on the assumption of the position of the IRS. The Court will not consider this argument in deciding the Plaintiff's motion, as it seeks summary judgment on a claim which had not been pleaded when the motion was made. Federal pleading is governed by very liberal rules of construction, *see* Fed.R.Civ.P. 8, but even construing the first amended complaint broadly, the Court cannot read into it a claim by the Plaintiff that it is seeking priority over the Bank's claim by exercising the specific voiding powers given to the Debtor-in-Possession. The claim as stated in that complaint is that the Bank has no valid interest in the funds; it cannot be construed as an attempt to avoid an existing interest. In order to assert a claim to void the Bank's interest, the Plaintiff needed to amend its complaint to add this claim.[3] It had not done so prior to the submission of the motion for summary judgment, and thus this Court will not consider it as a basis for summary judgment. This ruling determines the Plaintiff's motion for summary judgment insofar as it concerns the validity of the Bank's security interest in the funds; it does not consider the arguments vis a vis the IRS's position.

Even if the complaint could be construed to state a claim to assert the IRS's position, the motion would have to be denied because the record in this case lacks proper evidence of the IRS's position. The only evidence in the record is an unverified copy of a taxpayer's copy of a notice of tax lien, and unsupported, conflicting statements by counsel in their memorandum. There is no competent evidence as to the filing or nonfiling of the notice of lien, or the status of the IRS at the time of the filing of the petition. The Court is in no position at this time to determine the validity of the Bank's interest vis a vis the IRS even if that claim was before it.

2. Subsequent to the filing of the cross motions for summary judgment, and this Court's preliminary oral ruling on the motions, the Plaintiff moved to amend its complaint to assert the IRS's position. The Bank did not object to the late amendment, and thus it was allowed. This opinion does not address any new issues raised in the second amended complaint. If the Plaintiff still desires to assert the IRS's position in light of the IRS's involvement (see footnote 1), it must file another motion for summary judgment and allow the Bank a chance to respond.

3. This was done in the second amended complaint which is not the subject matter of this ruling.

The issue to be decided by the motions for summary judgment is whether the Bank, at the time of the filing of the petition, was holding the funds pursuant to a valid security interest. The Plaintiff's claim that it is entitled to turnover is premised on its contention that the Bank did not have a valid security interest in the funds.

LEGAL ANALYSIS

The Bank asserts it has a validly perfected possessory security interest in the funds under the provisions of Article 9 of the Uniform Commercial Code. The Court finds that the Oregon version of Article 9 does not apply to the Bank's security interest. ORS 79.1040(12) excludes from the scope of Article 9 transfers of interests in deposit accounts. Deposit accounts are defined as "demand, time, savings, passbook or like account maintained with a bank, savings and loan association, credit union or like organization, other than an account evidenced by a certificate of deposit." ORS 79.1050(1)(e). Official comment seven to UCC 9–104 states that security interests in deposit accounts are excluded from Article 9 because "such transactions are often quite special, do not fit easily under a general commercial statute and are adequately covered by existing law."

The Bank seeks to avoid the exclusion created by ORS 79.1040(12) by asserting that this transaction does not involve a "transfer" of an interest in a deposit account. It contends that since the account was created solely to serve as collateral, there was no "transfer" of an account at all. The Court, while finding this argument logically appealing, cannot agree with the Bank's interpretation. It appears from the official comments, and the cases applying the exclusion, that Section 9–104(*l*), codified as ORS 79.1040(12), was intended to exclude from Article Nine all security interests, except for proceeds, in deposit accounts. *See* Zubrow, *Integration of Deposit Account Financing into Article 9 of the Uniform Commercial Code: A Proposal for Legislative Reform,* 68 Minn.L. Rev. 899 (1984). In *Duncan Box & Lumber Co. v. Applied Energies, Inc.,* 165 W.Va. 473, 270 S.E.2d 140 (1980) and *Walton v. Piqua State Bank,* 204 Kan. 741, 466 P.2d 316 (1970), the supreme courts of two states held that the UCC did not apply to security interests in deposit accounts which were created for the purpose of providing collateral for the banks.

The Bank also contends that the exclusion does not apply in this case because it actually took a security interest in the check the Debtor used to open the account and the proceeds of the check. Since the UCC applies to security interests in negotiable instruments and money, the Bank argues, it applies to the Bank's interest in the proceeds of the check. This argument ignores the fact that the Bank did not hold the check tendered by the Debtor, but cashed the check and credited it to the Debtor's account. The Bank's collateral was CJL's interest in the account, it was not the check itself, nor was it a specific fund of money, as the proceeds of the check were not physically segregated into a separate account. Thus, the provisions of Article Nine do not apply to this transaction. *See Duncan Box & Lumber Co. v. Applied Energies,* 270 S.E.2d at 145 n. 10.

The Court must determine the validity of the Bank's security interest in account # 69833 based on common law doctrines. Under the common law, security interests in deposit accounts are created by means of a pledge or an assignment. *Peoples National Bank of Wash. v. United States,* 777 F.2d 459 (9th Cir.1985). The Bank does not contend that there has been an assignment in this case, thus the Court must assess the Bank's interest based upon the law of pledges.

A pledge is a security interest in personal property that is created by a bailment of the personal property to the pledgee. The elements of a pledge are a pledgor and a pledgee, a debt or obligation, an agreement to create a security interest, and possession of the pledged property by the pledgee. 72 CJS "Pledges" § 5 (1951). To be effective, the pledgee's possession has to be complete, unequivocal and exclusive of the pledgor's possession in his own

right. *Casey v. Covorok,* 96 U.S. (6 Otto) 467, 24 L.Ed. 779 (1877). The security interest is perfected upon possession of the collateral; no filing or other notice is required. *Walton v. Piqua State Bank,* 466 P.2d at 327.

In order to determine whether the Bank obtained a valid pledge, the Court must examine the nature of the transaction and of the collateral. It is clear that CJL intended to give, and the Bank intended to take, a security interest in the account to secure the Bank's issuance of the Letter of Credit. What CJL had to offer the Bank as collateral was not the funds themself because at the moment the funds were deposited in the Bank, CJL no longer owned the funds. Title to the funds passed to the Bank when they were deposited in the account, and the relationship between the parties became that of creditor—debtor. *State v. Tausher,* 227 Or. 1, 360 P.2d 764 (1961). What CJL had to pledge was its right to withdraw those funds, and such right is considered a chose in action. *Id.* Thus, this Court must determine whether the Bank held a pledge of CJL's intangible property, its right to withdraw the funds.

The early common law recognized pledge interests only in tangible property. Courts were initially troubled by the idea of pledging intangible property because the underlying concept of a pledge required physical possession by the creditor, and it is difficult to find physical possession of an intangible. In the best tradition of the common law, the courts found a way to solve the problem of pledging an intangible by adopting the "indispensable instrument" concept. Under that doctrine, a document representing the intangible is vested with many of the characteristics of the actual chattel, and the intangible may be pledged by delivery of the representative instrument. *Duncan Box & Lumber Co. v. Applied Energies,* 270 S.E.2d at 144; and *Walton v. Piqua State Bank,* 466 P.2d at 327.

Pledges of deposit accounts have traditionally been governed by the indispensable instrument doctrine. *See Peoples Bank of Wash. v. U.S.,* 777 F.2d at 461. In the ordinary case, where the intangible is represented by an indispensable instrument, requiring possession of the instrument to effectuate a pledge is warranted and uniformly enforced. In recent years, however, the courts have been forced to attempt to apply the common law of the pledge to a growing variety of modern deposit accounts which are not symbolized by indispensible instruments. In *Miller v. Wells Fargo Bank International,* 540 F.2d 548 (2nd Cir.1976), the Court of Appeals for the Second Circuit rejected a claim that the bank held a pledge of an account because it was the only party having a Telex key and key code to an overseas account. The Court cited the traditional common law "indispensible document" rule, but chose not to base its ruling solely on the absence of a transfer of an indispensible instrument. It chose instead to discuss the parties' control over the account, and concluded that the bank failed to prove that it alone had control over the account. 540 F.2d at 563.

In *Duncan Box & Lumber Co. v. Applied Energies,* 270 S.E.2d 140, the West Virginia Supreme Court faced facts very similar to those at bar. An account was created to secure obligations to the bank. The depositor's right to the account was not represented by an indispensible document, but the Court held that this did not prevent the bank from holding a valid pledge of the account. The Court discussed at length the evolution of the common law pledge, and determined that in light of the realities of modern commercial financing, the situation between the bank and the depositor was "functionally equivalent to a common law pledge." 270 S.E.2d at 145. The Court held: "where ... a bank by agreement with its depositor, creates a reserve account with the depositor's funds as security for loans made by the bank to the depositor, and retains the exclusive possession and control over the account, such account meets the requirements of a common law pledge." The Court focused on the pledgee's exclusive control over the collateral as the key element of a pledge.

In reaching the conclusion it did, the West Virginia Supreme Court, without expressly stating so, in effect adapted the common law of pledges to meet the reali-

ties of present day financial transactions. In so doing, the court was acting precisely as earlier courts did when they created the "indispensible instrument" doctrine in response to the commercial realities of that time. This is a proper role of the courts in applying common law doctrines to modern problems, and exhibits the flexibility the drafters of the UCC, and the state legislature, must have desired by excluding deposit accounts from the provisions of the UCC. The Oregon Appellate Courts have not had occasion to address this issue, but this Court finds the reasoning of the West Virginia Supreme Court to be persuasive. Thus, this Court will determine whether the Bank has a valid pledge of CJL's interest in the account according to the standards set forth in *Duncan Box.*

There is no genuine dispute as to the Bank's exclusive control of the account after January 27, 1985, the date it debited the account. Even the Debtor admits that "after the debit had been made, ... the bank had exclusive and unequivocal control of these assets." (Memorandum in Support of Debtor's Motion for Summary Judgment p. 7). At that point, if not at the time the account was opened, the Debtor completely and totally lost whatever possible ability it had to access those funds. Thus, the Bank attained a valid pledge no later than January 27, 1985. It continued to hold the pledge until the time of the bankruptcy filing in October 1985 by its exclusive control over the Debtor's ability to access the funds.

CJL cites *Peoples National Bank of Wash. v. U.S.,* 777 F.2d 459, in support of its claim to assert the IRS's position. While the Court will not discuss the case in that context, it is appropriate to consider the discussion of the creation of a security interest in a deposit account that appears in that case. In *Peoples National Bank,* the Court of Appeals citing the "indispensible instrument" rule, held that where there was no transfer of an indispensible instrument the bank did not have a pledge of a deposit account. 777 F.2d at 462. This Court's ruling in the case at bar is not in conflict with that decision. The *Peoples National Bank* opinion contains very little information as to the nature of the deposit account in question. The reader cannot discern what type of account was involved or whether there was an indispensible instrument, such as a passbook, issued. All the opinion reveals is that the bank had placed no restrictions on the depositor's ability to withdraw the funds in the account, and that the security agreement entered into by the parties gave the bank no more control over, or interest in, the account than the bank would have had without the agreement. *Id.* It is apparent that even if the court had applied the rule established in *Duncan Box,* it would have found that no pledge was created. The *Duncan Box* opinion expressly states that if a depositor has the right to make withdrawals, there cannot be a valid pledge of the depositor's rights to the account. 270 S.E.2d at 146 n. 11.

The Bank also seeks relief from stay in order to pay to the Forest Service $17,000 on the letter of credit for the Split Rock contract. General Order 85-7 of the United States Bankruptcy Court for the District of Oregon requires that motions for relief from stay be filed separately from any other motion and in strict compliance with the procedures set out in Local Form 720.-50. The Bank has not followed this rule, thus the Court will not rule on its motion at this time. If the Bank feels it is necessary, it may file a separate motion for relief from stay in compliance with the local rules.

In conclusion, the Defendant's motion for partial summary judgment is granted. The Plaintiff's motion is denied. This Memorandum Opinion shall constitute Findings of Fact and Conclusion of Law, and pursuant to Bankruptcy Rule 7052, they will not be separately stated. Counsel for the Bank is directed to present an Order in accordance with this Memorandum.